N. PATRICK CROOKS, J.
¶ 165. (concurring.) As a justice of the Supreme Court of Wisconsin, I join the majority of this Court in voting to uphold the constitutionality of Act 10. In answering the legal questions put to us as we must, we affirm a legislative act that appears to have gone further than needed. For many *99 public workers, Act 10 effectively ended meaningful union representation carried out through statutory collective bargaining. This type of statutory collective bargaining has long been part of Wisconsin's progressive heritage.
¶ 166. It is my firm belief that individuals should have the right to organize and bargain collectively regarding their wages and the terms of their employment. As thoughtful people from across the political spectrum and around the world have long recognized, collective bargaining benefits workers, employers and society itself. Although Act 10 does not violate either the United States Constitution or the Wisconsin Constitution, it erodes longstanding benefits both to public workers and to public employers. I write separately to make clear what my vote in this case means and to emphasize the importance of policies that give rights to workers to organize and bargain collectively.
I. THE LEGAL FRAMEWORK
¶ 167. The legal questions in this case can be answered in no other way than the majority answers them. Because the affected workers retain "a right to associate for the purpose of engaging in those activities protected by the First Amendment,"[1] Act 10 violates neither their constitutional right of association nor their right to equal protection.[2] The collective bargaining rights at issue here are statutory, not constitutional rights.
*100 ¶ 168. As I stated in League of Women Voters v. Walker, another case in which plaintiffs made a purely facial challenge to the constitutionality of a statute, the limited question presented and the legal framework prescribed for answering it demand significant restraint on the part of this court:
With this type of facial challenge, the odds are against the plaintiffs at every turn. A court is bound to recognize the presumption that the statute is constitutional. Here, the plaintiffs must prove otherwise beyond a reasonable doubt. In considering such a challenge, a court must resolve any doubt about the constitutionality of a statute in favor of upholding the statute.
In short, the question before us in this case is not whether the [challenged statute] is good policy, not whether it accomplishes what it sets out to do, and not whether it is unfair under some circumstances to some individuals. The question before us in this case is solely this: starting with a presumption of constitutionality in its favor, are we persuaded beyond a reasonable doubt that the statute violates the Wisconsin Constitution in every circumstance? ...
The question here is not whether the [statute] is good policy, but whether the plaintiffs have proved beyond a reasonable doubt that the [statute] violates the Wisconsin Constitution on any of the grounds claimed by these plaintiffs. Given the framework within which the question must be answered, I agree with the holding of the majority that the plaintiffs have not shown beyond a reasonable doubt that the statute is unconstitutional, and I join that holding and the mandate. I can reach no other conclusion than to uphold [the statute] based on the purely facial challenge here. I therefore respectfully concur.
*101 League of Women Voters v. Walker, 2014 WI 97, ¶¶ 62-63, 68, 357 Wis. 2d 360, 851 N.W.2d 302 (Crooks, J., concurring) (internal citations and quotations omitted).
¶ 169. As was true in that case, the analysis required here is straightforward. Under the proper application of the correct legal standard and the relevant precedent, this is not a close call. Therefore the plaintiffs' challenge must fail.
II. HISTORICAL RECOGNITION OF COLLECTIVE BARGAINING AND ITS VALUE TO SOCIETY
¶ 170. The value and necessity of collective bargaining and the fair treatment of workers have been recognized by many thoughtful people. As we considered this case, I recalled the eloquence of Rerum Novarum, the 1891 encyclical of Pope Leo XIII that seriously discussed the questions of resolving conflicts between employers and employees fairly and justly. Though more than 120 years have passed since his writing, the encyclical retains a remarkable relevance with its thoughtful comments about workers, employers, unions and "free agreements" reached about wages, hours and conditions of employment.
¶ 171. This lengthy document acknowledges the delicate task it undertakes, takes care to avoid extremist language and specifically rejects socialism as a solution to legitimate concerns of unjust working conditions. Instead, it adopts a respectful tone, recognizing the necessity of free enterprise to society, the value of work and the contributions of workers to their societies:
Now, for the provision of such commodities, the labor of the working class — the exercise of their skill, and the *102 employment of their strength, in the cultivation of the land, and in the workshops of trade — is especially responsible and quite indispensable... . Justice, therefore, demands that the interests of the working classes should be carefully watched over by the administration, so that they who contribute so largely to the advantage of the community may themselves share in the benefits which they create .... It follows that whatever shall appear to prove conducive to the well-being of those who work should obtain favorable consideration.[3]
¶ 172. From such philosophical foundations, the writing turns to practical considerations:
Let the working man and the employer make free agreements, and in particular let them agree freely as to the wages.... In these and similar questions however- — -such as, for example, the hours of labor in different trades, the sanitary precautions to be observed in factories and workshops, etc. — in order to supersede undue interference on the part of the State, especially as circumstances, times, and localities differ so widely, it is advisable that recourse be had to societies or boards such as We shall mention presently, or to some other mode of safeguarding the interests of the wage-earners; the State being appealed to, should circumstances require, for its sanction and protection.
The most important of all [such associations designed to aid workers] are workingmen's unions, for these virtually include all the rest. History attests what excellent results were brought about by the artificers' guilds of olden times... . Such unions should be suited to the requirements of this our age — an age of wider *103 education, of different habits, and of far more numerous requirements in daily life....
[T]o enter into a "society" of this kind is the natural right of man; and the State has for its office to protect natural rights, not to destroy them; and, if it forbids its citizens to form associations, it contradicts the very principle of its own existence, for both they and it exist in virtue of the like principle, namely, the natural tendency of man to dwell in society.[4]
¶ 173. After setting out this template for mutually respectful relationships between employer and worker, and explicitly endorsing the value of protective organizations such as "workingmen's unions," Pope Leo XIII goes on to state, "[EJvery precaution should be taken not to violate the rights of individuals and not to impose unreasonable regulations under pretense of public benefit."[5]
¶ 174. The encyclical concludes,
We may lay it down as a general and lasting law that working men's associations should be so organized and governed as to furnish the best and most suitable means for attaining what is aimed at, that is to say, for helping each individual member to better his condition to the utmost in body, soul and property.[6]
¶ 175. This recognition of the critical importance of a worker's right to collective bargaining was also central to the political philosophy of one of the most influential public figures in Wisconsin history, United States Senator Robert M. La Follette. Identifying the forces arrayed against the working person in the early twentieth century, La Follette stated at the outset of the *104 1912 presidential primaries, in which he was a candidate, "I demand protection of wage-earners and farmers in their right to organize and to defend themselves by means of unions. All other issues are subordinate to this great issue."[7]
¶ 176. Interestingly, Ronald Reagan, a United States President some would consider to be from the other end of the political spectrum, expressed similar convictions. In 1980, the year he was elected, Reagan gave an impassioned Labor Day speech in which he pledged that "American workers will once again be heeded" and promised to "consult with representatives of organized labor on those matters concerning the welfare of the working people of this nation."[8]
¶ 177. He noted his own union affiliation and experiences:
I happen to be the only president of a union ever to be a candidate for President of the United States. As president of my union — the Screen Actors Guild — I spent many hours with the late George Meany,[9] whose love of country and whose belief in a strong defense against all totalitarians is one of labor's greatest legacies. One year ago today on Labor Day George Meany told the American people:
As American workers and their families return from their summer vacations they face growing *105 unemployment and inflation, a climate of economic anxiety and uncertainty.
Well I pledge to you in his memory that the voice of the American worker will once again be heeded in Washington and that the climate of fear that he spoke of will no longer threaten workers and their families.[10]
¶ 178. Reagan went on to focus on the role of unions in bringing about a dramatic transformation of communist Poland:
These are the values inspiring those brave workers in Poland. The values that have inspired other dissidents under Communist domination. They remind us that where free unions and collective bargaining are forbidden, freedom is lost.... Today the workers in Poland are showing a new generation not how high is the price of freedom but how much it is worth that price.[11]
III. CONCLUSION
¶ 179. It is my view that the Wisconsin Legislature and Governor could have chosen a different way to accomplish a goal of cost savings that would have left intact meaningful union representation carried out through statutory collective bargaining for public employees. It is also my view that the damage to public employee unions due to Act 10 was unnecessary. It is a departure from Wisconsin's strong tradition.
¶ 180. Act 10 embodies policy determinations, and such questions are not properly addressed to the members of the Supreme Court of Wisconsin. Such *106 policy questions are for the Wisconsin Legislature and Governor, and their judgment on such policy matters is for the people of Wisconsin to evaluate. I respect the boundaries the judicial branch must observe and recognize that we cannot substitute our judgment on questions of policy for that of the Wisconsin Legislature and Governor.[12] Accordingly, I respectfully concur.

 Majority op., ¶ 75 (recognizing that the equal protection argument hinges on the merit of the associational rights claim); see also majority op., ¶ 24 ("Whether the plaintiffs' First Amendment challenge to these provisions has any merit is the lynchpin of this appeal.").

 Leo XIII, Rerum Novarum: Encyclical of Pope Leo XIII on Capital and Labor (1891), in Leo XIII, Rerum Novarum, at ¶ 34 (Catholic Truth Soc'y 2002), available at http:// www.vatican.va/holy_father/leo_xiii/encyclicals/documents/ hf_l-xiii_enc_15051891_rerum-novarum_en.html.

 Id. at ¶¶ 45, 49 and 51.

 Id. at ¶ 52.

 Id. at ¶ 57.

 Robert M. La Follette, The Republican Party Faces a Crisis (1912), reprinted in The Political Philosophy of Robert M. La Follette As Revealed in His Speeches and Writings 408 (Ellen Torelle, ed., 1920).

 Ronald Reagan, Labor Day Speech at Liberty State Park, Jersey City, New Jersey (Sept. 1, 1980), available at www.reagan.utexas.edu/archiveslreferencel9.1.80.html (last visited May 29, 2014).

 George Meany was president of the AFL-CIO from 1955 to 1979. See Owen Ullman, George Meany, Labor's "Giant" Is Dead at 85, Nashua Telegraph, January 11, 1980, at 6.

 Ronald Reagan, Labor Day Speech at Liberty State Park, Jersey City, New Jersey (Sept. 1, 1980), available at www.reagan.utexas.edularchives/reference/9.1.80.html (last visited May 29, 2014).

 Id.

 "Our duty ... requires that we uphold the separation of powers by not substituting judicial policy views for the views of the legislature or rule making authority." State ex rel. Griffin v. Smith, 2004 WI 36, ¶ 19, 270 Wis. 2d 235, 677 N.W.2d 259.